**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

NEXT GENERATION SYSTEMS, INC.,

          Plaintiff,

    v.

BROCADE COMMUNICATIONS
SYSTEMS, INC.,

          Defendant.

Civil Action No.:

JURY TRIAL DEMANDED

## ORIGINAL COMPLAINT

Plaintiff Next Generation Systems, Inc. ("NGS") alleges the following for its complaint against Defendant Brocade Communications Systems, Inc. ("Brocade").

## THE PARTIES

1.    Plaintiff is a corporation formed under the laws of the State of Ohio having its principal place of business at 4215 Rushmore Place, Beavercreek, Ohio 45430.

**2.**    Defendant is a corporation organized under the laws of the State of Delaware with a principal office at 130 Holger Way, San Jose, California 95134.  Defendant may be served with process via its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

## JURISDICTION AND VENUE

3.    This is a patent infringement and misappropriation of trade secrets action.  The Court has subject matter jurisdiction over the patent claim and federal common law claims pursuant to 28 U.S.C. §§1331 and 1338.  The Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

4.      The Court has personal jurisdiction over Brocade, as it is incorporated in this State.  Brocade has also availed itself, under the Delaware long arm statute, of the rights and benefits of this District by conducting business in this jurisdiction, including by promoting products for sale via the internet, which are accessible to and accessed by residents of this District.

5.      Venue is proper in this District pursuant to 28 U.S.C. §§1391(b)-(c) and §1400(b), because Brocade resides in this District and substantial acts of infringement have occurred in this District.

## BACKGROUND

NGS Develops QoS Technology

6.      Plaintiff NGS was founded in 2000 by Gary Warden and Martin H. Davis Jr. to develop and provide data storage solutions.

7.      Around June 2000, NGS began working on getting funding from the federally funded Small Business Innovation Research (SBIR) program to conduct research and develop products in the Fibre Channel market.  NGS submitted its proposal for SBIR funding and received the initial SBIR funding in 2000.

8.      Communication between devices in a computer network is carried out via various types of channels.  One such channel is a Fibre Channel switching fabric.  In the early 2000's, there were four classes of Fibre Channel switches, each of which was used to provide different classes of service in a channel.  For example, a Class 1 switch provided point-to-point connections between devices in which 100% of the bandwidth of the switch was allocated to those devices.  As envisioned in the standard, a Class 4 switch provided a virtual connection between devices with guarantees of certain bandwidth and transmission latency that was important in transmitting audio, video, and other similar data.  Class 4 switches required certain

delimiters in the headers of the frames transmitted in order to implement the connection guarantees.

9.      To facilitate NGS' work, also in 2000, Mr. Warden (then President of NGS) attended a meeting of the INCITS technical committee T11, which is the committee responsible for developing standards for Fibre Channel interfaces as part of the International Committee for Information Technology Standards.

10.     At the June 2000 T11 meeting, there were discussions regarding whether it was technically possible to make a Class 4 switch in accordance with the existing standard, which contained certain QoS requirements.  One of the main engineers for Brocade, Jeff Stai, stated that he did not believe that it was technically possible.

11.     Kumar Malavalli, a co-founder and then Chief Technology Officer of Brocade also attended the June 2000 T11 meeting and was present for the discussions.  During the committee's discussion and/or in related discussions, Mr. Malavalli stated that he believed the QoS (Quality of Service) was going to become increasingly important in the Fibre Channel market.

12.     In a private discussion at the meeting's conclusion, Mr. Warden told Mr. Malavalli that Mr. Warden could develop such a Class 4 switch capable of practicing the standard.  Mr. Malavalli offered to invest in NGS in exchange for NGS giving Brocade a first look at the technology Mr. Warden developed.  NGS accepted Mr. Malavelli's offer.  The investment of approximately $1M in NGS was made through an investment firm of which Kumar's daughter Ranjini Malavalli was the sole shareholder.

13.     After Mr. Warden's conversation with Mr. Malavalli, NGS modified the focus of the work for which it was receiving SBIR funding to work on designing Class 4 switches.  This

modification was approved by the government, which also awarded NGS a second round of SBIR funding for which it had applied earlier in 2000 for a total of just under $1.1M in SBIR funding.

14.     Mr. Warden began his work on QoS by working to implement a Class 4 switch which would follow the then existing standard for Class 4 switches and have the specified QoS capabilities.  However, he also needed someone to develop new host bus adapters ("HBA") so that the new switches could be used with existing communication channels.  NGS struggled to convince any other company to invest in developing the new HBA needed.  Based on its founder's experience in the industry, NGS came to believe that it would need one of the major original equipment manufacturers ("OEM") to adopt the new type of switch before any other company would commit to developing a new HBA to make it work.  Thus, NGS was left in a chicken and egg situation in which it was developing a product that needed a complementary product developed in order to prove that the NGS product worked.

15.     As Mr. Warden was traveling on business on September 11, 2001, he realized that he needed to design a switch that would not need a new HBA in order to move his company forward to be able to show OEMs that the new switch would be economically feasible.  Mr. Warden realized that he needed to adapt existing switches, particularly in Class 2 and Class 3, to have the desired QoS capability without requiring other changes of equipment in the communications channel.

16.     Mr. Warden and others at NGS, including Mr. James Cunningham and Mr. Nathan Kragick, changed their previous course and worked on a new switch design over the next several months, completing a working prototype of a switch employing QoS in Fibre Channel Class 2 and Class 3 around December 2001.

NGS Discusses Its QoS Technology with Brocade

17.     As NGS had promised, it presented its new switch to Brocade prior to presenting it to any other OEM.  Prior to that presentation, NGS and Brocade entered into a Non-Disclosure Agreement dated March 21, 2002 in which Brocade agreed not to disclose NGS' Confidential Information according to the terms of that Agreement.  Similarly, Brocade agreed not to use NGS' Confidential Information for any purpose other than to evaluate whether to enter into a business relationship with NGS.

18.     On April 9, 2002, NGS filed a provisional patent application on the technology developed by Messrs. Warden, Cunningham, and Kragick.

19.     NGS' initial April 18, 2002 presentation to Brocade was attended by Steve Wilson, Bob Snively, and several other key people from various organizations within Brocade. Over the next few months, talks between the companies continued.  Mr. Snively told Mr. Warden that Mr. Snively believed that Brocade should do a deal with NGS at that time.  During a private meeting during the T11 committee meeting in June 2002, Mr. Wilson asked Mr. Gary Stephens of NGS and Mr. Warden to consider how Brocade's existing switches could be converted to support QoS.

20.     NGS evaluated Brocade's switches based on information available publicly and provided by Mr. Wilson and determined that Brocade's switches would need significant additions in order to support Class 4 or any other QoS service.  NGS also informed Mr. Wilson in June and July 2002 of NGS' provisional patent application on the technology that it had demonstrated to Brocade in March and which would be needed to change Brocade's switches to be able to support QoS service.

21.     After presenting to Brocade and waiting to hear whether Brocade wanted to pursue developing the technology, NGS continued to work on trying to get money to make more prototypes.  NGS again faced the dilemma that other companies did not want to get into the QoS space if major OEMs like Cisco and Brocade were not committed.

22.     In the fourth quarter of 2002, Brocade told NGS that it was not interested in working together, because Brocade believed there was insufficient demand for the QoS product. By that time, it was too late for NGS to obtain enough funding to keep its business afloat. Although the investment group associated with Mr. Malavelli's daughter provided some bridge funding and NGS cut salaries, it did not have enough financing by the end of 2002 to keep its business alive.  In early 2003, NGS ceased operating other than to continue to pursue its patent application and collect payments on its licensed technology.

NGS Obtains a Patent on its QoS Technology

23.     In April 2003, NGS filed a utility patent application claiming priority to its provisional application from 2002.  That patent application eventually issued on June 10, 2008 as U.S. Patent No. 7,385,982 (the "'982 Patent") entitled "Systems and methods for providing quality of service (QoS) in an environment that does not normally support QoS features." A true and correct copy of the '982 Patent is attached as Exhibit A hereto.

24.     NGS is the sole and exclusive owner of all right, title, and interest in the '982 Patent and holds the exclusive right to take all actions, including the filing of this patent infringement lawsuit, necessary to enforce its rights to the '982 Patent.  NGS also has the right to recover all damages for past, present, and future infringement of the '982 Patent and to seek injunctive relief as appropriate under the law.

<u>NGS Discovers Brocade Stole NGS' Technology and Misled NGS About the Market</u>

25.     Because NGS ceased operating in 2003, Mr. Warden, Mr. Davis and the other employees of NGS moved on to other employment.  Thus, NGS had no continued involvement in the T11 committee or any other standards body related to Fibre Channel.

26.     However, in Fall 2011, Mr. Warden was working on an avionics engineering project and actively participating in SAE International, the standards setting organization for the avionics industry.  In working on an SAE standard that defined Fibre Channel as a weapons system databus, Mr. Warden wanted to revise the standard to incorporate the idea of QoS but he wanted to determine whether he could make that change without implicating NGS' '982 Patent.

27.     Mr. Warden therefore contacted his colleague Robert "Bob" Kembel to get his input on how to add QoS to the SAE standard.  Mr. Kembel was active in the T11 committee at the time and, on November 8, 2011, sent Mr. Warden a published patent application by Brocade related to QoS as well as the latest T11 standard revision to the FC-SW-4 standard.

28.     Mr. Warden reviewed this information and came to believe that NGS' work had been incorporated into the standard, such that Brocade's (or anyone else's) practice of the standard was likely infringing the '982 Patent.   Mr. Kembel's communication was the first time that Mr. Warden or anyone associated with NGS heard about the incorporation of NGS' work into the T11 standard.

29.     After Mr. Warden became aware of the T11 FC-SW-4 standard incorporating the QoS work by NGS, he further investigated how this incorporation could have occurred.  NGS learned that a mere 18 months after Brocade told it that the QoS capability was not desired by the market, Brocade presented NGS' technology as its own to the  T11 standards committee around

July 30, 2004.  Brocade then continued to work on the T11 standards committee, ultimately culminating in the adoption of the FC-SW-4 standard in April 2006.

30.     NGS also learned that around January 22, 2008, Brocade launched a service called Adaptive Networking Services, which appears to implement NGS' patented and otherwise proprietary QoS methods and system.  NGS believes that Brocade continues to sell those services along with a variety of switches that infringe the claims of the '982 Patent and otherwise incorporate technology confidentially disclosed to Brocade by NGS.

**COUNT ONE**
**INFRINGEMENT OF U.S. PATENT NO. 7,385,982**

31.     The foregoing paragraphs are incorporated herein by reference.

32.     Defendant has infringed and continues to directly infringe one or more claims of the '982 Patent, including at least Claim 13, either literally or by equivalents, by manufacturing, using, selling, offering for sale, and/or importing products into the United States that include an input port(s), output port(s), queue(s), and a processor coupled to those ports that is configured to examine non-QoS headers of frames received at an input port, classify those frames to associate them with particular QoS circuits and schedule transmission of those frames based on the classification to meet certain QoS requirements.  Accused Products include but are not limited to Brocade's Fibre Channel switches, such as the 6505, 6510, and 6520; other products running Fabric OS; and the DCX 8510 Backbone.

33.     Defendant's acts of manufacturing, using, selling, offering to sell, and/or importing the Accused Products into the United States are without the permission of NGS and constitute infringement under 35 U.S.C. §271 for which Brocade is liable.

34.     Brocade has known of the '982 Patent since the provisional application to which it claims priority and either knew of its issuance and the scope of its claims, should have known

of its issuance and the scope of its claims, or intentionally blinded itself to the issuance and the scope of the claims of the '982 Patent.

35.     Moreover, shortly after the '982 Patent issued in June 2008, Mr. Warden informed Mr. Malavalli about the issuance.  NGS believes that in 2008, Mr. Malavalli, who continues to have a close relationship with various employees of Brocade, told his former colleagues at Brocade about the issuance of the '982 Patent.

36.     Further, Brocade also knew about the '982 Patent at least as early as September 22, 2009 when it was cited by the Patent Examiner as a prior art reference used to reject then-pending claims of a Brocade patent application that would later issue as U.S. Patent No. 7,707,309.  Brocade also submitted the '982 Patent itself as a prior art reference on an information disclosure statement filed on March 11, 2010 during the prosecution of its patent application that later issued as U.S. Patent No. 7,877,512.

37.     Moreover, from October-December 2011, Brocade was contacted by a broker on behalf of NGS who offered to sell the '982 Patent to Brocade.  Thus, at least as of this date, Brocade knew about the '982 Patent and its potential application to Brocade's business.

38.     Brocade also knew or should have known that there was an objectively high risk that it would be infringing at least one claim of the '982 Patent directly or indirectly by using and offering Fibre Channel switches and systems with QoS capability.

39.     Brocade's acts of infringement therefore have been willful with full knowledge of the claims of the '982 Patent.

40.     As a result of Brocade's infringement, NGS has been damaged monetarily and is entitled to adequate compensation of no less than a reasonable royalty pursuant to 35 U.S.C. §

284.   As a result of Brocade's willful infringement, Plaintiff is further entitled to enhanced damages pursuant to 35 U.S.C. § 284 and attorneys' fees under 35 U.S.C. § 285.

**COUNT TWO**
**MISAPPROPRIATION OF TRADE SECRETS/CONFIDENTIAL INFORMATION**

41.   The foregoing paragraphs are incorporated herein by reference.

42.   NGS shared trade secret/confidential information with Brocade in 2002 concerning NGS' development of QoS capability for existing switches.  This information included, but was not limited to, the information disclosed in the '982 Patent, which was not published at the time, as well as information on practical QoS implementation such as buffering techniques and requirements and system set-up using a variety of switches.

43.   NGS shared this information during a time when Brocade had agreed to and had a duty to keep that information confidential and not use it for any purpose other than to determine whether to join with NGS in a business venture.

44.   Instead of joining with NGS in a business venture, Brocade strung NGS along throughout most of 2002, only telling NGS that it had no interest in pursuing the QoS technology together late in 2002.  Although Brocade told NGS at the time that Brocade did not believe there was an adequate market for the technology, that representation was clearly false.

45.   Beginning in 2002 and continuing for the next several years, Steve Wilson and others at Brocade used the information from NGS to develop the T11 FC-SW-4 standard as well as Brocade patents and products.

46.   During that time, Mr. Wilson and his colleagues at Brocade knew that they had received the NGS information in confidence with the requirement that it not be used for Brocade's own purposes.

47.     Having gone out of business in 2003, based at least in part on Brocade's decision not to jointly pursue increasing QoS capability in Fibre Channel switches, NGS did not learn of Brocade's unauthorized use of NGS' information until November 2011.

48.     Brocade's secret and unauthorized use of NGS' confidential/trade secret information damaged NGS, including by contributing to its inability to maintain its business operations past 2003.  Brocade took advantage of having NGS' information and damaged NGS by treating that information as its own and gaining a competitive advantage in pursing QoS capabilities through its own developments after ensuring that NGS was out of the market.

49.      As one of the major OEM's in the Fibre Channel market, Brocade stole from NGS knowing that its market power would prevent NGS from having any real chance of further developing and succeeding with a new technology that Brocade did not support.  Brocade's misappropriation of NGS' confidential/trade secret information was willful and malicious and conducted with the intent to drive NGS out of business and develop the QoS switch market on its own.  NGS has been damaged by Brocade's improper acts and is entitled to punitive damages as a result.

<u>**COUNT THREE**</u>
<u>**UNJUST ENRICHMENT**</u>

50.     The foregoing paragraphs are incorporated herein by reference.

51.      NGS conferred a benefit on Brocade in 2002 by sharing NGS' information and expertise in the area of QoS capability development for Fibre Channel switches.

52.     Brocade knew of this benefit and sought it out by participating in multiple meetings and correspondence with NGS personnel primarily through the Spring and Summer of 2002, whereby Brocade gained considerable information and expertise that it did not previously have in the QoS area.

---

**ORIGINAL COMPLAINT**

53.     Brocade retained this information and expertise and used it to develop the market for switches with certain QoS capabilities and functionality after telling NGS that such a market did not exist.  It would be unjust to allow Brocade to take NGS' work and benefit from including that work in the T11 standard for Fibre Channel switches and in developing Brocade's own products without compensating NGS for its contribution and without recognizing that Brocade's actions at least in part forced NGS out of business and allowed Brocade to benefit from a lack of competition and development expense.

54.     NGS is entitled to compensation from Brocade in the amount by which Brocade was unjustly enriched.

## COUNT FOUR
## CONVERSION

55.     The foregoing paragraphs are incorporated herein by reference.

56.     Brocade has exercised dominion or control over NGS' confidential information concerning at least modifying and developing switches to add QoS capabilities which NGS shared with Brocade in 2002.

57.     NGS did not agree to Brocade's use of NGS' information in the T11 standard or in Brocade's own patents and product development.

58.     Brocade's use of NGS' information was inconsistent with NGS' right to control the use and release of that information and damaged NGS.

59.     NGS is entitled to compensation from Brocade for Brocade's conversion of NGS' information and treatment of that information as its own.

## JURY DEMAND

Plaintiff requests a jury on all issues so triable.

## **PRAYER**

WHEREFORE, Plaintiff respectfully requests that the Court:

    A.  Enter judgment that Defendant has directly infringed, either literally or by equivalents, the '982 Patent;

    B.  Enter judgment that Defendant has willfully infringed, either literally or by equivalents, the '982 Patent;

    C.  Award Plaintiff damages for Defendant's infringement in an amount to be determined at trial, including enhanced damages, costs, and pre and post-judgment interest;

    D.  Award Plaintiff its reasonable attorneys' fees pursuant to 35 U.S.C. §285

    E.  Award Plaintiff actual damages and punitive damages for Defendant's misappropriation of Plaintiff' trade secrets and confidential information;

    F.  Award Plaintiff compensation in the amount by which Defendant unjustly enriched itself through its improper acts;

    G.  Award Plaintiff actual damages sufficient to compensate it for the conversion of its information by Defendant; and

    H.  Award any other relief deemed just and proper.

Dated: April 29, 2014

OF COUNSEL:

Paul V. Storm
Sarah M. Paxson
GARDERE WYNNE SEWELL LLP
1601 Elm Street, Suite 3000
Dallas, Texas  75201
(214) 999-3000
pvstorm@gardere.com
spaxson@gardere.com

STAMOULIS & WEINBLATT LLC

/s/ *Richard C. Weinblatt*
Stamatios Stamoulis #4606
   stamoulis@swdelaw.com
Richard C. Weinblatt #5080
   weinblatt@swdelaw.com
R Touhey Myer #5939
   myer@swdelaw.com
Two Fox Point Centre
6 Denny Road, Suite 307
Wilmington, DE 19809
Telephone: (302) 999-1540

*Attorneys for Plaintiff*
   *Next Generation Systems, Inc.*